Thomas P. GRANT, Jr., Plaintiff,

v.

GANNETT CO., INC., and the News-Journal Company, Defendants.

Civ. A. No. 79–515.

United States District Court,
D. Delaware.

April 21, 1982.

George Tyler Coulson, Wilmington, Del., for plaintiff.

Richard G. Elliott, Jr., of Richards, Layton & Finger, Wilmington, Del., for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

Thomas P. Grant, Jr. joined the News Journal Company in 1947 and, except for his service in the U. S. Air Force between 1951 and 1955, worked with the company until his dismissal on August 27, 1979. Grant started as a clerk in the classified advertising department, became the classified advertising manager in 1966, and held that position until his dismissal.

On January 30, 1978, the Gannett Company purchased the News Journal Company. Brian Donnelly, who had managed Gannett properties in Binghampton, New York, Rockford, Illinois and Newburgh, New York, was installed as the new publisher of the News Journal. Donnelly replaced Andrew Fisher. In the period between Gannett's takeover and Grant's dismissal, the two positions in the organizational hierarchy between Grant and the publisher's office also changed hands. Frederick Walter, executive vice president and general manager of the News Journal Company, retired in June 1978. Lynn Bryan, Director of Advertising, resigned on May 11, 1979. Walter's position was not filled; his responsibilities were taken over largely by the publisher's office. Bryan was replaced by Jack Skinner, who had been Advertising

Director of the Gannett paper in Sioux Falls, South Dakota until his transfer to Wilmington.

Plaintiff Grant brought suit under 29 U.S.C. § 626(c) which authorizes civil suits by persons alleging dismissal or other grievance within the ambit of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634. Grant alleges that his dismissal was motivated by Gannett's policy of replacing senior employees with younger people. He argues that but for his age, he would not have been confronted with the choice between taking early retirement or being terminated in August of 1979.

■ The ADEA closely tracks in both purpose and remedial structure the statutory scheme developed by Congress to remedy discrimination based on race, color, religion, sex or national origin.[1] Consequently, federal courts have broadly endorsed[2] the application to ADEA cases of the "shifting burden" analysis developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) in the context of racial discrimination under Title VII of the Civil Rights Act of 1964.[3] The Third Circuit is among the courts that have adopted the *McDonnell Douglas* standard, as elaborated in subsequent Supreme Court cases,[4] and applied it to ADEA cases.[5]

In *Rodriguez v. Taylor*, 569 F.2d 1231, the Third Circuit defined a prima facie case under Title VII as one in which plaintiff has shown that he is a member of a protected class and that he was rejected for a job vacancy for which he was qualified. The Court then announced that "[u]nder the ADEA also plaintiffs are held only to a prima facie case of age discrimination." *Id.* at 1239. In *Smithers v. Bailar*, 629 F.2d 892 (3d Cir. 1980), the circuit court recited and, implicitly, approved the district court's finding that plaintiff had made his prima facie case based on a four element test: (1) plaintiff belonged to the protected class; (2) he applied and was qualified for the position; (3) he was not appointed, despite his qualifications; (4) the position was ultimately filled by a younger employee.[6] This standard, in the context of someone who alleges age discrimination because he or she has been dismissed from a position held rather than denied a position applied for, has been approved by a number of other courts.[7]

---

1. *Compare* 29 U.S.C. § 623(a)(1), (2) with 42 U.S.C. § 2000e–2(a)(1), (2). *See also, Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979) (parallel sections of ADEA and Title VII should be similarly interpreted); *Laugesen v. Anaconda Co.*, 510 F.2d 307, 311 (6th Cir. 1975); *Hodgson v. First Federal Savings & Loan Ass'n*, 455 F.2d 818, 820 (5th Cir. 1972).

2. *See Smithers v. Bailar*, 629 F.2d 892 (3d Cir. 1980); *Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir. 1977). *See also Sutton v. Atlantic Richfield Co.*, 646 F.2d 407 (9th Cir. 1981); *Kelly v. American Standard Inc.*, 640 F.2d 974 (9th Cir. 1981); *Houser v. Sears Roebuck Co.*, 627 F.2d 756 (5th Cir. 1980); *Kephart v. Instit. of Gas Technol.*, 630 F.2d 1217 (7th Cir. 1980), *cert. denied* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383; *Loeb v. Textron*, 600 F.2d 1003 (1st Cir. 1979); *Toussaint v. Ford Motor Co.*, 581 F.2d 812 (10th Cir. 1978); *Laugesen v. Anaconda Co.*, 510 F.2d 307 (6th Cir. 1975).

3. 42 U.S.C. § 2000e *et seq.*

4. *See, e.g., Texas Dept. of Community Affs. v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct.

295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

5. *See Smithers v. Bailar*, 629 F.2d 892 (3d Cir. 1980) (*McDonnell* guidelines deemed applicable in ADEA cases); *Rodriguez v. Taylor*, 569 F.2d 1231, 1239 (3d Cir. 1977) *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414, *See also, Kunda v. Muhlenberg College*, 621 F.2d 532, 543 n.3 (3d Cir. 1980) (articulating Third Circuit's interpretation of *McDonnell Douglas* burden shifting).

6. 629 F.2d at 895, *quoting Smithers v. Bailar*, Civ.No. 77–0949 (D.N.J. Sept. 28, 1979).

7. *See Kelly v. American Standard Inc.*, 640 F.2d 974 (9th Cir. 1981) held that a prima facie case required: (1) membership in the class; (2) discharge; (3) qualification for the position, and (4) replacement by one outside the protected class. 640 F.2d at 980. *See also Houser v. Sears, Roebuck Co.*, 627 F.2d 756 (5th Cir. 1980); *Cova v. Coca Cola Bottling of St. Louis*, 574 F.2d 958 (8th Cir. 1978); *Carolan v. Central Freight Lines*, 489 F.Supp. 941 (E.D.Tex.1980).

Born in 1922, Grant was within the class protected by the ADEA at the time of his dismissal. The position of classified advertising manager was filled by Raymond Nemtuda, who was 38 at the time of Grant's termination.[8] The only ground upon which Defendants challenge the adequacy of Plaintiff's prima facie case is his qualification for the job.[9]

*"Qualification" as Part of Prima Facie Case*

At the conclusion of Plaintiff's case, Defendants News-Journal and Gannett moved for a directed verdict arguing that Plaintiff failed to make out a prima facie case of age discrimination. The Court denied the motion. Defendants, in their post-trial briefs, continue to argue that Plaintiff failed to establish a prima facie case because he did not demonstrate " 'that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance.' "[10] Defendants further argue that the degree of qualification required to establish a prima facie case must be such that plaintiff "was performing his job at a level consistent with his employer's legitimate expectations."[11] The Court cannot accept Defendants' interpretation of this standard.

■ While qualification is both an important element of establishing a prima facie case and a protection against placing courts in the position of reviewing bona fide business decisions, the ADEA, like Title VII, is a remedial statute[12] designed to eliminate discrimination in the workplace.[13] The evidentiary rules of *McDonnell Douglas* should not be so mechanically applied as to interfere with the overall purpose of the ADEA. Defendants' interpretation of the qualification test in *Loeb* would essentially require a plaintiff, in making a prima facie case, to establish that no aspect of his conduct—conduct that may or may not yet be in the record—could be interpreted to justify dismissal because of inadequate qualification. That interpretation raises beyond reason the threshold for making a prima facie case and collapses the stages of the *McDonnell Douglas* procedure. To require plaintiffs, as part of their prima facie case, to "rule out the possibility" that they were discharged on the basis of some "legitimate expectation" would be to require them, in effect, to prove pretext. Requiring plaintiffs to preclude even the possibility of dismissal for non-qualification goes beyond what the Supreme Court has stated to be the proper interpretation of a "prima facie case" in the context of evidentiary burden shifting:

> The phrase "prima facie case" may denote not only the establishment of a legally mandatory, rebuttable presumption,

---

**8.** Nemtuda became 39 on September 1, 1979. He was both younger than Grant and, because under 40 years of age, was outside the class protected by the ADEA. Moreover, he promptly succeeded to Grant's former position. Consequently, the Court expresses no opinion on the necessity or sufficiency of any one of those elements in establishing a prima facie case. *Compare Kelly v. American Standard Inc.,* 640 F.2d 974 (9th Cir. 1981) (replacement from outside protected class) and *Houser v. Sears Roebuck Co.,* 627 F.2d 756 (5th Cir. 1980) (outside protected class) *with Smithers v. Bailar,* Civ.No. 77–0949 (D.N.J. Sept. 28, 1979) *quoted in* 629 F.2d 892 (3d Cir. 1980) (replacement younger than plaintiff) and *Cova v. Coca Cola Bottling,* 574 F.2d 958 (8th Cir. 1978) (after discharge position remained open and employer solicited applications from persons of similar qualification). *See also Douglas v. Anderson,* 656 F.2d 528, 533 (9th Cir. 1981).

**9.** Defendants' Opening Brief at 69.

**10.** Defendants' Opening Brief at 62, 69; Defendants' Answering Brief at 28, *quoting Loeb v. Textron, Inc.,* 600 F.2d 1003, 1013 (1st Cir. 1979).

**11.** Defendants' Answering Brief at 29, 30. It is noted that this phrase also closely tracks language in *Loeb, supra*: "Loeb had to prove . . . that he was performing his job at a level that met his employer's legitimate expectations. . . ." *Id.* at 1014.

**12.** *See, e.g., Dartt v. Shell Oil Co.,* 539 F.2d 1256 (10th Cir. 1976), *aff'd by equally divided Court,* 434 U.S. 886, 98 S.Ct. 256, 54 L.Ed.2d 171; *Kerwood v. Mortgage Bankers Ass'n,* 494 F.Supp. 1298 (D.D.C.1980); *Marshall v. Arlene Knitwear Inc.,* 454 F.Supp. 715 (E.D.N.Y.1978).

**13.** *See Zinger v. Blanchette,* 549 F.2d 901 (3d Cir. 1977), *cert. denied,* 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750.

but also may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue.... *McDonnell Douglas* should have made it apparent that in the Title VII context we use "prima facie case" in the former sense.[14]

■ Despite the language that Defendants have repeatedly quoted,[15] *Loeb v. Textron* itself demonstrates sensitivity to the issue of qualification in a prima facie case. In a footnote to the passage upon which Defendants have relied, the *Loeb* court stated: "We can assume that, unless the employee's job has been redefined, the fact that he was hired initially indicates that he had the basic qualifications for the job, in terms of degrees, certificates, skills and experience."[16] Moreover, the *Loeb* court discussed a plaintiff's burden of proving pretext "even where, as here; the proffered 'legitimate reason,' poor job performance, disputes one of the elements of a prima facie case." *Loeb*, 600 F.2d at 1014. Thus, the court in *Loeb* implicitly recognized that the degree of qualification required to make out a prima facie case is not the same as proving that one was performing at a level that would preclude being dismissed for legitimate business reasons. This Court declines to require proof of absolute qualification in establishing a prima facie case under the ADEA where to do so would raise a threshold for prima facie cases that exceeds the standard established by the Supreme Court.[17]

### Grant's Prima Facie Qualification

■ Grant held the post of classified advertising manager from 1966–1979 through the administration of more than one publisher. During that period he received regular salary increases.[18] He also received bonuses and other incentive rewards for the performance of the classified department.[19] At the end of 1978, after approximately one year of Gannett ownership of the News Journal, Grant received a $1,000.00 bonus based on the performance of the classified department.[20] In the context of making a prima facie case of age discrimination, the Court finds that the testimony recited above, as well as other evidence in the record, establishes that Grant was prima facie qualified to serve as the classified advertising manager of the News Journal.

While the Court acknowledges that qualification is not a static concept[21] and that "qualified" under the previous ownership was not necessarily "qualified" under Gannett, it is apparent that Grant ran his subdepartment with enough competence to "justif[y] some explanation on the part of

14. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 n.7, 101 S.Ct. 1089, 1094 n.7, 67 L.Ed.2d 207 (1981). *See Burris v. Davidson Transfer & Storage Co.*, 527 F.Supp. 930 (D.Del.1981).

15. *See* note 9 *supra.*

16. 600 F.2d at 1013 n.10.

17. *See Douglas v. Anderson*, 656 F.2d 528, 533 n.5 (9th Cir. 1981) ("In establishing a prima facie case, [plaintiff] need only produce substantial evidence of satisfactory job performance sufficient to create a jury question on the issue.").

18. *See* PX–89 ex. 35; Transcript Vol. C p. 110 [hereinafter references to the trial transcript will be shortened to the form: T-letter-for-volume, page number; e.g., T–C110]. The Court, in noting Grant's salary history at this time does not rule on whether the magnitude of his raises relative to the inflation rate of 1976–79 constituted a signal of management's discontent with Grant's performance. *Cf.,* Defendants' Opening Brief at 6.

19. Plaintiff's Opening Brief at 1: "In each year of his employment plaintiff received a raise in salary and a bonus until bonuses were combined with salary in 1975 (PX–89 ex. 35, A–29)."

20. T–D152 (Donnelly testimony). The bonus, which was *not* accompanied by any salary increase, reflected rewards for " 'lineage gains in the classified area' (PX–33)." Plaintiff's Opening Brief at 2.

21. *Kephart v. Instit. of Gas Tech.*, 630 F.2d 1217 (7th Cir. 1980) ("To ignore the shifting nature of qualification from time to time would make the qualification requirement [of *McDonnell Douglas*] meaningless...." *Id.* at 1219).

the employer." [22] The issue at this juncture is not whether such an explanation was provided in the course of cross examining Plaintiff's witnesses. The Court denied Defendant's Motion for a Directed Verdict at the conclusion of Plaintiff's case. At this stage, it is necessary only to analyze the evidence of the entire trial in the framework of the *McDonnell Douglas* shifting burden procedure. Within that framework, Grant made a prima facie case and shifted to Defendants the burden of articulating a legitimate, non-discriminatory reason for Grant's dismissal.

*Rebutting the Prima Facie Case*

In *Burdine, supra,* the Supreme Court explained that a defendant employer's articulation of non-discriminatory reasons for his action vis-a-vis the plaintiff performs two functions. First, it serves "to meet the plaintiff's prima facie case by presenting a legitimate reason for the action." [23] Second, it "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." [24] The Court went on to state that defendants' rebuttal should be evaluated in terms of how well it accomplishes those ends. The burden is not a heavy one. As stated in *McDonnell Douglas, supra,* and explained in both *Burdine* and *Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), the defendant's duty is to *articulate* rather than to *prove* a non-discriminatory reason. "[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." [25]

■ Defendants have clearly met their burden of articulating non-discriminatory reasons for dismissing Grant. In particular, the testimony of Brian Donnelly, Gannett's first publisher of the News Journal, indicates to the Court that Grant's performance did not meet with the management style that Gannett expected to be able to impose on its new Wilmington operations. Through Donnelly and other witnesses, the Court heard extensive testimony about Gannett interest in and programs for equal opportunity, especially the advancement of women and minorities [26]; performance evaluations [27]; and monthly meetings.[28] Don-

---

**22.** *Wilson v. Sealtest Foods Div.,* 501 F.2d 84, 87 (5th Cir. 1974). *See Douglas v. Anderson,* 656 F.2d at 533 n.5; *Kerwood v. Mortgage Bankers Ass'n,* 494 F.Supp. 1298 (D.D.C.1980). The Court further notes that despite their contentions of Grant's non-qualification with regard to a prima facie case, Defendants argued strenuously that if he had made a diligent and timely effort, Grant would have found a classified advertising manager's position with another newspaper. *See* Defendants' Opening Brief at 81–83; T–C47–C80.

**23.** 450 U.S. at 255, 101 S.Ct. at 1094 (1981).

**24.** *Id.* at 255–56, 101 S.Ct. at 1094–95. *See also Sutton v. Atlantic Richfield Co.,* 646 F.2d 407 (9th Cir. 1981) (*Burdine* standard applied in context of ADEA case).

**25.** 450 U.S. at 257, 101 S.Ct. at 1095. The Court distinguished between evidence that would "allow a trier of fact rationally to conclude" and that which would "*persuade* the trier of fact that the employment action was lawful." *Id.* (emphasis original).

**26.** *See, e.g.,* PX–14, Memo: Donnelly to Dep't Heads, March 15, 1978, Re: Performance Evaluations, Dress Code, Equal Opportunity Policy, Scheduling Supervisor Training; PX–89 ex. 2, Memo: Donnelly to Dep't Heads, March 22, 1978, Re: "Timetable for Implementation of New Employee Relations Programs"; DX–14, Minutes of Meeting (attended by Grant) on Affirmative Action and other topics, October 12, 1978. *See also* T–D116, D127–28 (testimony of Donnelly), PX–89 ex. 15 (supervisory training session April 12, 1979, attended by Grant).

**27.** *See, e.g.,* PX–89 ex. 28, Program Outline from May 1978, "Performance Appraisal Discussions," attended by Grant August 1, 1978; T–D123, D142–44 (testimony of Donnelly); PX–89 ex. 8, Memo: Donnelly to File, Dec. 20, 1978, Meeting with Bryan, Black and Grant about poor quality of performance evaluations.

**28.** *See, e.g.,* Memo: Slabach to Donnelly, Dec. 8, 1978, Status Report on Monthly Meetings (shows classified dept. eight months behind schedule in making reports; T–A222 (Grant acknowledges that monthly meeting minutes were not always written up) (testimony of Grant); PX–89 ex. 2, *supra* note 26.

nelly and other management-level employees testified that Grant had a "negative" attitude and resisted Gannett programs.[29]

These factors were clearly set forth by Defendants and, taken at face value, would allow the trier of fact to conclude that the decision to terminate Grant was not motivated by discriminatory purpose. Defendants' rebuttal testimony also clearly developed the evidence and arguments to which Plaintiff's proof of pretext would have to be directed.

*Evidence of Pretext*

The ADEA does not put the Court in a position to second guess the management decisions of newspaper publishers or any other employers. The Court's inquiry is limited to whether age is a determinative factor in employment decisions.

■ Grant failed to persuade the Court by a preponderance of the evidence that "but for" his age he would not have been dismissed from his position at the News Journal on August 27, 1979. Age was not a determinative factor in the decision to terminate Grant's employment.[30] Grant failed to meet the burden of proving that the reasons articulated by Defendants for their decision were merely pretext.

The Court is persuaded that the Gannett management at the News Journal found Grant unresponsive to what was, by all accounts, a substantial change in management style.[31] Much like the plaintiff in *Kerwood, supra,* Grant had had the luxury of significant autonomy for a long period before the News Journal Company was sold. That situation changed with the advent of Gannett ownership.

Plaintiff introduced very little affirmative evidence of age as a factor in his dismissal. His principal strategy seemed to be to make out his prima facie case and exhaustively to refute the Defendants' proffered non-discriminatory justifications.[32] This is a difficult strategy in light of the volume of material Defendants presented to rebut the prima facie case, the minimal evidence of discrimination introduced by Plaintiff and Plaintiff's burden to prove age discrimination by a preponderance of all the evidence.

Plaintiff's most direct evidence of age discrimination was the testimony of Robert Larrimore, the 60 year old assistant classified advertising manager. Larrimore reported meeting with Jack Skinner on August 6, 1979,[33] regarding Larrimore's status, present and future, with the paper. Larrimore memorialized the meeting and his

**29.** *See, e.g.,* T–D133–34 (Donnelly found Grant negative even at first luncheon) (testimony of Donnelly); T–F45–49 (Grant's failure to participate in Atlanta seminar) (testimony of Mark Arnold, Gannett vice president for advertising); T–F16, F22 (Grant's non-participation in Atlanta) (testimony of Jack Heselden, senior vice president of Gannett); T–F134 ("Mr. Grant never made a positive suggestion to me in the month or five weeks we were together.") (testimony of Jack Skinner, Advertising Director of News Journal in 1979); T–F136 ("Tom Grant would not work with me. . . . I never got any help. I never got any suggestions.") (testimony of Skinner).

**30.** An ADEA plaintiff need not prove that age was the *sole* factor in his or her dismissal. *Smithers v. Bailar,* 629 F.2d 892 (3d Cir. 1980); *Geller v. Markham,* 635 F.2d 1027, 1035 (2d Cir. 1980); *Loeb v. Textron,* 600 F.2d 1003 (1st Cir. 1979); *Kerwood v. Mortgage Bankers Ass'n,* 494 F.Supp. 1298 (D.D.C.1980). The ADEA states its prohibitions in terms of causation: "It shall be unlawful for an employer . . . to

discharge an individual . . . because of such individual's age." 29 U.S.C. § 623(a). This standard has been implemented in terms of requiring plaintiffs to prove "but for" causation, 600 F.2d at 1019, or that age was "a determinative factor," 629 F.2d at 897, in the employment decision.

**31.** The change was most colorfully characterized by Robert Curtiss, who described the News Journal before Gannett as "a candy store." T–H5. He characterized Gannett's operation as "a much more demanding situation." T–H6.

**32.** The Court does not criticize this approach. Such a strategy, however, places on Plaintiff the burden of demonstrating that "the employer's proffered explanation[s] [are] unworthy of credence." 450 U.S. at 256, 101 S.Ct. at 1095. *See also* Plaintiff's Answering Brief at 44.

**33.** Skinner was the Director of Advertising at that time.

memo was introduced into evidence.[34] While Larrimore did not intend to discuss Grant's status when he requested the meeting, he reported that the subject came up. Larrimore testified that Skinner told him he would move into a redefined position and that "a new Manager and an Assistant Manager would be appointed"[35] and that "they would be younger and that at least one would be a woman."[36]

Skinner's testimony regarding the August 6, 1979 meeting agrees with Larrimore's on the subject of redefining Larrimore's role and recruiting a new classified ad manager from within the News Journal.[37] On the point of the age and sex of these new people, however, Skinner strongly disagreed with Larrimore's recollection.[38]

Larrimore's memo also notes discussion of early retirement for Grant. The Court finds the conversation between Larrimore and Skinner, conducted in the expectation that Grant would vacate his position by retiring,[39] is, at best, equivocal evidence of any intention to remove Grant because of his age. Skinner's testimony is at least as credible as Larrimore's and Skinner had no personal stake in the outcome of any redistribution of responsibility within the classified department.

The rest of Plaintiff's evidence of discriminatory animus at the News Journal goes to Gannett policy and does not directly relate to Plaintiff's situation. Plaintiff cites a statement made by Allen Neuharth, Chairman of Gannett as of 1979, at the corporation's annual meeting. The report of the meeting quotes Neuharth as saying that "newspapers . . . cannot practice either the best of journalism or the best of business if most decisions are made by middle aged white males."[40] The quoted statement is made in the context of endorsing and encouraging the company's "Partnership for Progress" program to promote equal opportunity for women and minorities.[41] It cannot be taken as a statement of policy on the issue of age. Moreover, it is not specifically addressed even to the News Journal, let alone Mr. Grant. Standing on its own, it does not suggest that Grant was dismissed because of his age.

Similarly, the November, 1978 memorandum from Gannett General Counsel John Jaske to all publishers regarding changes in the coverage of the ADEA does not relate to Grant's case in particular.[42] It does not necessarily reflect any discriminatory animus at all, but if it does, the impermissible policy would be against rehiring retirees. This would be probative of a general bias at Gannett against older employees only if linked to something more directly relevant to Grant than the arguments based on the meeting between Skinner and Larrimore.

*Conclusion*

After careful examination of all the evidence presented at a lengthy trial, the Court finds that Plaintiff Grant successfully made out a prima facie case of age discrimination, but ultimately failed to

---

**34.** PX–75. Memo to file "Conversation with Jack Skinner re my status with News Journal". *See also* T–C170–171 (text of memo read into the record).

**35.** PX–75, T–C170 (testimony of Larrimore).

**36.** *Id.*

**37.** Deposition of Jack Skinner at 35 (PX–110); T–F142.

**38.** *Id.* at 35. Skinner was "very positive" that he did not say anything about the age or sex of the people to replace Grant and Larrimore. He further stated, that to have done so would "go against everything I believe in." *Id.* at 37. *See also* T–F142 ("I didn't tell him [Larrimore] that they would be younger. I didn't tell him that at least one would be a woman.") (testimony of Skinner).

**39.** T–F143 ("I really felt that Tom would come to some kind of agreement with the company, seriously felt and hoped that it would be true.") (testimony of Skinner).

**40.** PX–118, Gannett Co., Inc., Annual Meeting of Shareholders at 8.

**41.** *See* PX–122, Deposition of John E. Heselden at 61 (Heselden's interpretation of the statement quoted from PX–118).

**42.** PX–27, Letter from John B. Jaske to All Publishers (Nov. 14, 1978) (discussing amendments to the ADEA extending coverage to age 70).

meet his burden of proving by a preponderance of the evidence that age was a determinative factor in his dismissal by the News Journal. Since the Court has found the Defendants not liable to Plaintiff, there will be no consideration of the many damages and compensation issues raised by counsel in their arguments and briefs.

This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.